INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AGRICULTURAL AND IMPLEMENT WORKERS OF AMERICA, Plaintiff-Appellee,

v.

DANA CORPORATION, Defendant-Appellant.

No. 80–3458.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 9, 1981.

Decided June 4, 1982.

Rehearing En Banc Granted and Opinion Vacated Aug. 12, 1982.

Richard Walinski, John Czarnecki, Hayward, Cooper, Straub, Walinski & Cramer, Toledo, Ohio, Allen Siegel, Arent, Fox, Kinter, Plotkin, & Kahn, Washington, D. C., for defendant-appellant.

Gerald B. Lackey, Joan Torzewski, Green, Lackey & Nusbaum, Toledo, Ohio, John A. Fillion, Leonard R. Page, M. Jay Whitman, Associate Gen. Counsel, Detroit, Mich., for plaintiff-appellee.

Before EDWARDS, Chief Judge, MARTIN, Circuit Judge, and TAYLOR,* District Judge.

---

ANNA DIGGS TAYLOR, District Judge.

The Dana Corporation seeks this court's review, pursuant to 28 U.S.C. § 1292(a)(1) and 29 U.S.C. § 110, of a Temporary Restraining Order and Preliminary Injunction which were entered pending arbitration of Dana's alleged breach of a neutrality agreement with the United Automobile Workers. Dana appeals the District Court's adjudication of its contempt of the temporary restraining order, as well. We affirm the orders of the Honorable Don J. Young, Senior Judge.

Dana, a corporation with its principal place of business in Toledo, Ohio, and in interstate commerce within the meaning of 29 U.S.C. §§ 142, 152, and 185(a), has had a collective bargaining relationship with the appellee labor organization since at least 1956. The parties have negotiated and executed National Master Agreements every third year since then, the most recent of which was executed on behalf of Dana and the International as well as 25 UAW Locals, and is effective by its terms from December 3, 1979 through December 5, 1982. It governs the terms and conditions of employment of approximately 12,000 employees. Section 3 of that contract provides that there shall be no application of the contract or any supplement thereto, "or should any trouble or controversy of any kind arise with respect to the employees within the unit as between company and union." Instead, all such disputes are to be resolved with utmost dispatch only through the Grievance Procedure. It is also provided, at Section 37, that any dispute over "interpretation and/or application of terms" may be raised directly between the UAW Dana Department Director and appellant's General Office Industrial Relations Department. Failure to agree is appealable directly to the parties' permanent arbitrator. Section 38 provides that the Arbitrator's decision "shall be final and binding upon both the Union and the company."

Since 1976, supplements to the Master contract have included an agreement that

---

* Honorable Anna Diggs Taylor, District Judge, United States District Court, Eastern District of Michigan, sitting by designation.

Dana would maintain a position of neutrality when the Union seeks to organize workers at Dana facilities. The most recent agreement on this subject is evidenced by the December 2, 1979, letter of Dana's Corporate Director of Industrial Relations to the UAW's Director of its Dana Department, which states in pertinent part:

> In the course of the 1979 negotiations of the Master Agreement you requested a letter concerning relationships of certain Dana facilities in which the employees are not represented by any union.
>
> Over the years Dana and the United Auto Workers have developed a constructive relationship based on trust, integrity, and mutual respect. Our management is dedicated to an autonomous organizational structure for our various divisions. However, we recognize that certain matters cut across divisional lines and require a corporate position.
>
> Our corporate position regarding union representation is as follows:
>
> We believe that our employees should exercise free choice and decide for themselves by voting on whether or not they wish to be represented by the UAW or any other labor organization.
>
> We have no objection to the UAW becoming the bargaining representative of our people as a result of such an election. Where the UAW becomes involved in organizing our employees, we intend to continue our position of maintaining a neutral position on this matter. The company and/or its representatives will communicate with our employees, *not in an anti-UAW manner,* but in a positive pro-Dana manner.
>
> If a majority of our employees indicate a desire to be represented by the UAW, we will cooperate with all the parties involved to expedite an NLRB election. In addition, we reserve the right to speak out in any manner appropriate when undue provocation is evident in an organizing campaign. (Emphasis added.)

The UAW's chief negotiator with Dana for 18 years, Donald Rand, testified that the issue of neutrality had "... some position of urgency on that collective bargaining list" for the Union in 1979; and that the letter represented a change of language from the 1976 agreement. It had been strengthened in favor of the union, because of the union's unfortunate experience in an Oklahoma organizing drive despite the 1976 letter supplement. Mr. Rand's testimony was that "As a result of that experience, we felt it was needed to strengthen the letter and that is what we have done in the recent contract, improved upon it." The letter was then highlighted both in speeches and in written materials to the UAW Delegate body in its ratification deliberations, and to the membership of the UAW in obtaining its ratification of the National Master Contract. Mr. Rand testified that he would not have recommended ratification without that neutrality supplement.

The parties have stipulated that the Wix Corporation of Gastonia, North Carolina, is a wholly-owned subsidiary of Dana. Union negotiator Rand testified that, prior to the letter of supplement "... during the negotiations we specifically referred to the Wix Corporation. After we had the agreement, knowing so well that it covered that situation, then we directed our organizers to become involved in the Wix Plant in Gastonia."

Accordingly, by letter of December 12, 1979, the UAW Dana Department notified Dana's Industrial Relations Director:

> ... that the UAW has begun an organizing drive involving the production and maintenance employees of the Dana Corporation's Wix facilities located at Gastonia, North Carolina.
>
> We would expect you to advise the Dana Wix Company representatives of the Dana corporation's position relating to neutrality. Also, we would expect the Wix company representatives at Gastonia to adhere to the letter of neutrality as well as the intent of the parties regarding neutrality during an organizing campaign by the UAW.

The UAW then petitioned the NLRB for an election to determine a collective bargaining agent for the above-identified Wix

employees, and the Board set June 12, 1980, as the date for an election. Dana had refused to agree to an expedited election. Dana's office of the General Counsel (which includes a staff of at least eight in-house attorneys) advised the corporation's Director of Industrial Relations that the neutrality letter was binding on the corporation with respect to Wix. The union's organizing drive was underway. UAW organizers distributed the neutrality letter among Wix-Gastonia employees, as reassurance of Dana's neutrality.

On April 28, 1980, President Benny S. Hoyle of Wix Corporation directed a letter to all "Fellow Employees." That letter stated, most notably:

1. That "Dana is *opposed* to having the Wix plants become unionized." Neither this statement, nor Hoyle's authority to make it, has ever been repudiated by Appellant.

2. That "The Union does not provide job security," citing 25 to 30% of Dana's union employees on long and indefinite layoffs, without prospects of return.

3. The hint that the Wix policy of ample overtime work to meet demand may, for unexplained reasons, be supplanted by a rule of frequent hires and frequent layoffs, if the UAW were elected.

4. That a UAW victory will result in renegotiation of ALL pay and benefit plants, "from the ground up."

On April 30, 1980, the UAW filed a grievance protesting Dana's violation of the neutrality supplement with the Dana Industrial Relations Department Director, pursuant to § 37 of the Master Agreement. By letter of May 2, 1980, Dana reiterated its neutrality agreement, adding that it is "applicable to all Dana facilities," and noting that it would be in the best interest of all concerned to expedite the NLRB election and "conclude this matter." On May 9, 1980, after failure of the parties to agree, the union appealed directly to the Permanent Arbitrator.

Arbitration of the union's grievance was first scheduled for May 16, 1980, but the date was cancelled by Dana, because it was unprepared. The hearing was then rescheduled for May 24, but the parties agreed to postpone it on Dana's express representation that there would be no more violations of the neutrality letter until such time as the hearing could be held.

However, on June 2, 1980, President Hoyle addressed a four-page stream of vitriol to "All Wix Employees" (no longer "Fellows"). The letter opens with the bone-chilling question: "Are you willing to take a risk that we will have a vicious union strike here at Wix in the next year?" It descends thereafter from veiled to explicit threats, with simple anti-UAW statements interspersed. The letter specifically states Mr. Hoyle's ". . . hope (that) it is abundantly clear that this company has no intention of yielding to any such strike pressures either now or hereafter;" and that strikers risked loss of their jobs "*forever*," because "*we have every intention of exercising our right to replace strikers to keep these plants in operation.*" (Emphasis in original.)

On June 5, 1980, the union received a copy of the letter; and it demanded immediate emergency arbitration on Friday, June 6th. There was no response from Dana.

On Monday, June 9, 1980, the Union filed its complaint in the District Court, requesting a temporary restraining order enjoining Dana and its agents from violation of the letter agreement by anti-union, anti-UAW communications to Wix employees, pending hearing on the union's motion for preliminary injunction, and requesting an order compelling Dana to arbitrate the grievance. The District Court, after hearing arguments of counsel for both parties, found that the dispute between the parties concerning defendant's activities at Gastonia was, ". . . on its face, a breach of an agreement between plaintiff and defendant and this is arbitrable under the terms of the applicable collective bargaining agreement." Judge Young further found that plaintiff would suffer irreparable harm if Dana were unrestrained, inasmuch as the employees would continue to be subjected to anti-union, anti-UAW statements and

the election would be held on June 12, 1980, rendering a subsequent arbitration of the grievance no more than a "hollow formality." Accordingly, the Order was entered as requested directing arbitration forthwith and restraining Dana and its agents "from making anti-union or anti-UAW oral or written statements or other communications to its employees at its Gastonia facility or otherwise departing from a position of neutrality" regarding the election, pending hearing on the preliminary injunction. Dana was further directed to remove those materials from the Gastonia special bulletin boards which fell within the prohibition. Wix President Benny Hoyle was advised of the district court's order that same evening by Dana's general counsel, who later testified that he did not tell Mr. Hoyle to cease his activities.

The next day, June 10, 1980, President Hoyle delivered himself of an hour-long speech to each of the three shifts of Wix employees who worked, of which a transcript is in the record, and of which the District Judge later wrote:

> The evidence left no room for any doubt whatsoever that the defendant had violated the terms of the temporary restraining order. For almost an hour, President Hoyle harangued the defendant's employees with the most serious of anti-union statements, and dire threats of action that Wix would take against them if the union was recognized and the usual collective bargaining processes were resorted to. If one listens very carefully, it is possible to hear, amidst the torrent of verbiage, a few sentences which could perhaps be construed as pro-Dana, but it is hard to imagine a more complete violation of the temporary restraining order than President Hoyle's speech.

The court further noted that the special bulletin boards had not been cleared of anti-union propaganda. Mr. Hoyle's speech included the following statements here pertinent:

1. That unions, particularly the UAW, were no better than communists, and that he would prefer Russia to a union plant.

2. That he would prosecute anyone who taped his talk "to the full extent of the law."

3. That a union is a "pathway to trouble ... serious trouble"; that the jobs of strikers will be filled with permanent employees, and that strikers "can walk until their knees are bloody."

4. That one should "never, never predict a short strike, always think in terms of a long strike."

5. That the UAW not only believes in putting workers on strike, but that they will assess the workers for it, as well: so that this is "not a time to buy a new car or new furniture on the installment plan."

6. That, if things continue to go well, Wix will "continue to increase your pay and benefits quarterly," after reference to "the 1½% pay increase granted you last July."

7. Finally: "Keep these threats in mind when you sign the authorization card and vote this union in."

On July 11, 1980, the UAW filed a motion requesting that the District Court order Dana to show cause why it should not be adjudicated in contempt of the court's June 9th Order. The record reflects that counsel for both parties were present at the time of the request, and that the court set its show cause hearing for June 12, 1980, at 8:00 A.M. That, of course, was also Election Day at the Wix plant. Both the union and the District Judge requested that Dana join the UAW in seeking postponement of the NLRB election. Dana refused to so join and the union thereafter, after a six month organization drive, temporarily withdrew its Petition for Election.

On June 12th the contempt show cause was held and the union presented the testimony of several witnesses and a partial transcript of one of Hoyle's speeches. On June 20, the court entered its Memorandum Opinion and Order, containing findings of fact and conclusions of law in the matter, and holding Dana in contempt of the June 9th Order. Inasmuch as the UAW's delay of the election by withdrawal of its petition

had made a remedy for Dana's actions possible, the court directed Dana to purge itself of contempt by June 31, 1980, either by certain affirmative actions tending to reestablish the neutrality of Dana in the eyes of Wix employees, or by the payment of a fine of $250.00 per day.

On June 27, 1980, the District Court entered its preliminary injunction on the basis of the evidence taken at the contempt hearing and its finding that Dana's conduct, if continued, would remove all benefit from the neutrality agreement and render any arbitration a hollow formality. On July 9, 1980, the District Court denied Dana's motion for a stay of the preliminary injunction and purgation order.

## I.

Appellant first argues here that the Norris-LaGuardia Act of 1932, 29 U.S.C. § 104, categorically prohibits the issuance of the injunction which it appeals. We first note that courts were admonished by Congress at § 102 of that law that, in the Act's interpretation and in determinations of their jurisdiction and authority, ". . . the public policy of the United States is hereby declared as follows:

Whereas . . . the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are hereby enacted.

It is in the context of that stated congressional policy that we must apply the prohibition of § 104 against the issuance of injunctions in labor disputes, upon which Dana here relies.

We next note that, without repeal of the Norris-LaGuardia Act, the Congress, at § 301(a) of the Labor Management Relations Act of 1947 (29 U.S.C. § 185(a)), has provided that suits for violation of collective bargaining agreements may be brought in any United States District Court having jurisdiction of the parties. In *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, (1957), Justice Douglas wrote for the court that § 301(a) had authorized the federal courts to specifically enforce, at the instance of a labor union, a provision to arbitrate grievances, and to fashion a body of federal law for the enforcement of labor contracts. That body of federal law, by the entire tenor of the history of the Act, must include the recognition that an agreement to arbitrate is the *quid pro quo* for a union's agreement not to strike. Moreover, Justice Douglas wrote that Norris-LaGuardia presented no bar to injunctive orders to arbitrate, and indeed that § 8 of Norris-LaGuardia (29 U.S.C. § 108) indicated a clear Congressional policy even in that early Act of favoring settlement of labor disputes by arbitration, which rendered unnecessary in § 301 suits the stringent procedural requirements which § 7 of Norris-LaGuardia otherwise made requisite to the entry of an injunction in a labor dispute. Justice Douglas wrote, finally, that:

The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. (353 U.S. at 457, 77 S.Ct. at 918).

Thereafter, through his opinions in the "Steelworkers Trilogy" of 1960 (*United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; *United Steelworkers v. Warrior and Gulf Navigation*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, and *United Steelworkers v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424), Justice Douglas fashioned for the court the body of federal law which today obtains, in support of a demand for labor arbitration. He wrote in *Warrior and Gulf, supra,* that:

> An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. (363 U.S. at 582–3, 80 S.Ct. at 1352–53.)

In *American Manufacturing, supra,* he reiterated his finding of *Lincoln Mills* that:

> There is no exception in the "no strike" clause and none therefore should be read into the grievance clause, since one is the *quid pro quo* for the other. (363 U.S. at 567, 80 S.Ct. at 1346.)

In 1970, through *Boys Market v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, the court recognized new problems which did indeed lie in the penumbra of statutory mandates, as Justice Douglas had predicted, and through Justice Brennan's opinion approved a remedy which would effectuate legislative policy. The court, reversing its prior position (of *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440, 1962) although Congress had not amended the Norris-La-Guardia anti-injunction provisions since *Sinclair*, held that those provisions did not preclude a United States District Court from enjoining a strike in breach of a no-strike clause where the contract contains an arbitration clause enforceable under § 301(a) of LMRA for arbitration of the grievance concerning which the strike was called. The court wrote that:

> The literal terms of § 4 of the Norris-La-Guardia Act must be accommodated to the subsequently enacted provisions of § 301(a) of the Labor Management Relations Act and the purposes of arbitration. Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions. (398 U.S. at 250, 90 S.Ct. at 1592.)

The court traced the changing concerns of Congress from the early part of this century, when the courts were regarded as allies of management in repression of the nascent labor movement, which fact led to the 1932 enactment of Norris-LaGuardia to correct abuses; through its response in the Wagner Act to management practices which discouraged collective participation; to the NLRB's § 301(a) provision and its emphasis upon enforcement of collective bargaining contract obligations and administrative techniques for the peaceful resolution of industrial disputes; all of which changes were accomplished without extensive revision of older statutes, including the anti-injunction provision of Norris-LaGuardia. The court wrote that, inasmuch as our judiciary is committed to the accordance of full faith and credit to a promise to arbitrate, and a no-strike obligation, express or implied, is the *quid pro quo* for an employer's undertaking to submit to arbitration:

> Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking. On the other hand, the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded—if anything, this goal is advanced—by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration. (398 U.S. at 252–3, 90 S.Ct. at 1593–94.)

The *Boys Market* decision permits the district court to enjoin a strike over an arbitrable grievance only under clearly

defined circumstances, however, and for its description of those facts, it refers us to Justice Brennan's prior dissent in the *Sinclair* case, as follows:

> ... [T]he District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether the issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of the injunction than will the union from its issuance. (370 U.S. at 228, 82 S.Ct. at 1346.)

The *Boys Market* decision notably includes the finding that:

> Indeed, the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or *other self-help measures*. (Emphasis added.) (398 U.S. at 249, 90 S.Ct. at 1591.).

In subsequent decisions, other circuits have had occasion to affirm the issuance of injunctions which have met all of the criteria enunciated by *Boys Market*, but which have been directed not at strikes, but at employer self-help measures which were found to undermine the arbitral process to the extent of making arbitration a "hollow formality." In *Lever Brothers Co. v. International Chemical Workers Union*, 554 F.2d 115 (1976), the Fourth Circuit Court of Appeals affirmed the District Court's grant of a temporary restraining order and preliminary injunction against the employer's relocation of a plant, pending arbitration. The District Court was held to have appropriately exercised its discretion, within *Boys Market* constraints, by enjoining employer conduct which would have rendered the arbitral process a "hollow formality," after

which no award could have returned the parties to the status *quo ante*. The District Court had also correctly determined, as the *Steelworkers'* Trilogy directs, that the grievance in question was not specifically excluded from the parties' arbitration clause, and that the question of the interpretation of the contract must be left to the arbitrator and not decided by the court. The union's probability of prevailing on the merits, for purposes of equity-balancing for injunctive relief in such cases, was held to be properly measured by the probability that the union will prevail in its contention that the dispute is one for the arbitrator. Accordingly, if there is a genuine dispute with respect to an arbitrable issue, and the probability of irreparable harm falls most heavily on the union, the teaching of *Lever Brothers* is that such an injunction is properly entered.

In *United Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d 1273 (1979), the Court of Appeals for the Third Circuit affirmed a district court's injunction against employer self-help activity which it found would tend to undermine the integrity of the arbitral process to the irreparable injury of the union's members. The self-help in question was the termination of hospital and insurance benefit premium payments during a labor dispute. The Circuit Court agreed that the *Boys Market* exception to Norris-LaGuardia was applicable against acts taken or threatened by an employer, under certain circumstances. The facts to be examined on such a claim were held to be: 1) whether the underlying dispute is subject to mandatory arbitration; 2) whether the employer, rather than seeking arbitration of his grievance, is "interfering with and frustrating the arbitral processes which the parties had chosen" (598 F.2d at 1279); and (3) whether an injunction is appropriate under ordinary principles of equity.

This case requires this court to address that same problem, and we agree with the Fourth Circuit's *Lever Brothers* holding and with Judge Young, that the *Boys Market* exception to Norris-LaGuardia is applicable to employer acts which threaten to make "a

hollow formality" of the arbitral process, and would render a subsequent arbitrator's award a practical nullity. Such an injunction is only appropriate under a mandatory and binding arbitration clause (for which the union has paid with a no-strike clause); where the union has established a probability of prevailing in the sense that the dispute is by greater probability than not one for the arbitrator; and where the probability of irreparable harm falls more heavily on the union, absent an injunction, than on the employer by the grant of an injunction.

In this case, Judge Young's injunction meets all of the above standards. However, the element of irreparable harm requires further discussion. There is no question but that the harm to the union of this employer's election-eve conduct would be— and has been—irreparable. While delaying arbitration of the union's grievance, the employer repeatedly made not only anti-UAW communications, but serious threats to the employees whom union organizers had assured of his promised neutrality. A long organizing drive had been conducted, the entire point of which was to convince North Carolina employees of the strength and efficaciousness of the UAW as their representative in dealings with Wix. An arbitration award cannot restore a lost election. A post-election petition to the NLRB to set the election aside, even if granted, and even if implemented by a Board bargaining order to the employer, would hardly constitute the vote of confidence, show of unity, and mandate for confrontation necessary to enter into negotiations which may well drag on until decertification becomes possible. The 12,000 Dana employees already represented by the UAW have ratified a contract which they would not otherwise have been presented, and have paid with certain, if unknown, concessions as to the terms and conditions of their own employment, for Dana's assurance that precisely these eventualities would not occur. They are bound by a no-strike clause. The union has demonstrated irreparable damage.

Appellant argues, however, that the irreparable damage which it sustains by virtue of an injunction intruding upon rights assured it by the First Amendment of the United States Constitution outweighs all of the above considerations. That argument requires separate discussion.

## II.

■ We must first examine the extent to which Dana's communications to its employees are protected by the First Amendment under the circumstances of this case, through the directives and public policies expressed by Congress and the Supreme Court concerning First Amendment rights in the labor relations context; and then whether, as Appellant argues, a contractual waiver of the right to make such of its communications as may have been protected is unenforceable.

The National Labor Relations Act, § 8(c), [29 U.S.C. § 158(c)], provides that:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any provisions of this Act, *if such expression contains no threat of reprisal or force or promise of benefit.* (Emphasis added.)

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, (1969), the Supreme Court held that § 8(c) implements the First Amendment in a labor relations context. Justice Warren noted that an employer's right to communicate his views to his employees is firmly established, and cannot be infringed by either the union or the Board ... so long as no threat of reprisal or force or promise of benefit is made. However:

> Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c). (395 U.S. at 617, 89 S.Ct. at 1941, 23 L.Ed.2d at 580.)

Section 8(a)(1), in turn, prohibits interference, restraint, or coercion of employees in the exercise of their right to self-organization.

In *Gissel*, the court found the employer's statements that the "strike-happy" union would have to enforce its demands by a strike, which would probably result in plant shutdown as had occurred elsewhere in the area; and that the employees would have great difficulty in finding other employment, was speech unprotected by the First Amendment and properly found unlawful by the Board. The court wrote that:

Any balancing of these rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. (395 U.S. at 617, 89 S.Ct. at 1941, 23 L.Ed.2d at 580.)

*Gissel* further held that First Amendment protection extends even to an employer's predictions as to the unfortunate effects which he believes will result from unionization: but only insofar as such predictions are based upon objective fact, and concern consequences beyond his control. The employer in that case was found to have had no factual support for his basic assumption that the union, which had not yet even presented one demand, would have to strike to be heard. Such suggestions were not protected speech but threats: and so were the baseless suggestions made that other plant closings in the area were attributable to unionism. The speech found in *Gissel* to be unprotected by the First Amendment bears a remarkable resemblance to the communications for which appellant here seeks protection.

In *Henry Siegel Co. v. N.L.R.B.*, 417 F.2d 1206 (6th Cir., 1969), cert. den. 398 U.S. 959, 90 S.Ct. 2175, 26 L.Ed.2d 545, (1970), this court had occasion to consider a *Gissel* situation, without apparent benefit of Justice Warren's June, 1969, *Gissel* opinion. The result reached, however, was identical. Judge Combs wrote:

Section 8(c) of the Act gives an employer the right to express his opinion in opposition to the union, also the right to express argument in support of such opinion. But, his expressions may not contain a threat of reprisal. *He may not dress up a threat in the language of opinion.* Even though his statements may be expressions of opinion only, if their reasonable tendency is coercive in effect, they are violative of Section 8(a)(1). (Emphasis added.) 417 F.2d at 1215.

This court proceeded thereafter to find that the statements of an employer's agents to employees that they stood to lose by a possible reduction in wages and insurance benefits, and that the "destructive forces of unionism" included "strife, violence, law breaking, hostility between neighbors, and loss of work," were unprotected by § 8(c). They fell into the category of thinly veiled threats, rather than mere predictions or legitimate argument. Again, there are remarkable parallels between the communications of that case and those before this court.

Indeed, when the pre-injunction communications of Wix President Hoyle are evaluated against the scope of the First Amendment in the labor relations context, under the rule of *Gissel* and its progeny, it is clear that those communications are beyond the scope of this employer's First Amendment privilege, regardless of the neutrality agreement which it seeks to dishonor. The April 28th Hoyle letter purported to speak on behalf of Dana and has never been repudiated. It suggested that unionism has caused layoffs in other Dana plants and will at Wix; that overtime will cease and that lower pay and benefits may result from negotiations. Not one of those "predictions" is claimed to be based upon any objective fact. In his letter of June 2, 1980, President Hoyle's suggestions of a "vicious union strike" to which the company has "no intention of yielding," and which involves the risk of job loss "forever," are clearly unprotected threats. The speech to the employees of all three shifts on June 10th, after receipt of the injunction, fell com-

pletely within the proscriptive proviso of § 8(c).

Accordingly, inasmuch as the caselaw is uniform that communications such as those here in question are unprotected by the First Amendment, are violative of employee rights to free association, and are unlawfully coercive, the irreparable damage to appellant consequent upon an injunction restraining such speech pending arbitration of the neutrality agreement can hardly be held to outweigh the equities presented by the union. The injunction here entered, therefore, is appropriate under the general principles of equity.

 Finally, to the small extent that the communications here in question may have retained the mantle of First Amendment protection, Dana had executed a valid waiver of its First Amendment right to such expressions as might be characterized as "anti-UAW," rather than "pro-Dana," by its supplement letter to the union of December 2, 1979. The commitment was reiterated by letter of May 2, 1980, in response to union demand. The fact of that undertaking is undisputed either at the district court or here. Its precise application to the facts of this case is a matter for the labor arbitrator. (See "*Steelworkers* Trilogy" *supra*.) Its mere existence presented, however, the union's probability of prevailing to the extent of presenting a legitimate question for the arbitrator under the mandatory arbitration clause of these parties' contract (See *Lever Brothers*), and therefore was properly the basis of injunctive relief pending arbitration.

As to the validity of Dana's factually undisputed waiver of its First Amendment right to make "anti-UAW" communications, this court refers to *D. H. Overmyer v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124, (1972). In that case, Overmyer had given a cognovit note for certain consideration, waiving notice and hearing prior to entry of judgment, in case of default. On entry of such judgment, the debtor's appeal was based upon the claim that it could not constitutionally be held to have waived, in advance, its right to due process of law.

The court held that due process rights to notice and hearing prior to civil judgment are subject to waiver, and had been waived. Justice Blackmun examined applicable standards for judicial recognition of waivers in the criminal context, where personal liberty rather than property rights are involved (including waivers of the right to counsel, against self-incrimination, and to presence at trial), found that Overmyer's waiver met those standards, and did not decide whether a lower standard could be applied in civil cases. An accused's waiver of a constitutional right is required to be voluntary, knowing, and intelligently made, with full awareness of the legal consequences, to be valid. The controlling facts in holding that Overmyer's waiver was valid were (1) that Overmyer was a corporation of complex structure and widespread activities; (2) that the contract was not one of adhesion and the case not one of unequal bargaining power or overreaching; (3) that the initial contract had contained no confession of judgment, but the clause was only executed after Overmyer's delinquency in payment, in consideration for Frick's forbearance; (4) Overmyer did not contend that it, or its counsel, were unaware of the significance of the note; and (5) Overmyer was not rendered defenseless by the clause, because the judgment obtained could have been vacated upon a showing of valid cause. In the light of those circumstances, Overmyer's right to due process and hearing was held to have been voluntarily, intelligently, and knowingly waived in advance, with full awareness of the legal consequences. Justice Douglas, in concurrence, wrote that:

> Whatever procedural hardship the Ohio confession of judgment scheme worked upon the petitioners was voluntarily and understandingly self-inflicted through the arms-length bargaining of these corporate parties. (405 U.S. at 189, 92 S.Ct. at 784).

This court examined the standard applicable to a claim of waiver of First Amendment rights in *Sambo's Restaurants, Inc. v. City of Ann Arbor*, 663 F.2d 686, 1981. While recognizing that *Overmyer, supra,*

controlled, this court distinguished that case and held that, if Sambo's, Inc., had the First Amendment right in question at the time of the alleged waiver (1972), the waiver was invalid. The factors found controlling in the finding of invalidity were:

1. No agreement between the parties was entered which was binding as a matter of state law.

2. Insufficient consideration flowed to Sambo's, Inc., to evidence a valid waiver of its First Amendment right to the appellation of its choice. The only "benefit" received was held to have been approval of a site plan, which could not constitute a consideration as it was an action required by law.

3. There was no "clear and compelling" evidence of a waiver, as was required by the Supreme Court in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, (1967), a case in which the failure to interpose a constitutional defense in the trial court prior to decision was held not to waive invocation of that defense on appeal.

The concurrence in *Sambo's, Inc.*, was based upon the holding that a contract obtained through assault, fraud, duress, or extortion should not be recognized as binding.

This case meets all of the above-described standards for validity of a waiver, whether *Overmyer* alone is to govern, or this circuit's extension of that rule in *Sambo's*. The evidence of the contract is clear and compelling, even undisputed. It is a part of a binding collective bargaining agreement, enforceable under § 301(a) of LMRA. Dana has received benefits from its execution, in that a National Master Agreement with UAW was presented for ratification and ratified by 12,000 other Dana union employees which would not otherwise have been presented. It is clear from that testimony that the union has foregone other demands in exchange for the promise of neutrality. This is no contract of adhesion: and there is no disparity in bargaining power. Dana is a large and complex corporation, employing an entire Department of Industrial Relations personnel, as well as an in-house General Counsel staff. The neutrality agreement language here in question was new in 1979, and was a modification of the 1976 supplement, drafted by Dana's Industrial Relations Director to meet the union's request for a commitment stronger than that of 1976, which had caused the union difficulties. The parties discussed the UAW's plans to organize the Wix-Gastonia plant prior to the supplement, and contemplated precisely this situation in its execution. Neither Dana nor its counsel have ever contended a lack of understanding or awareness of the legal effect of the document. Dana is not rendered defenseless by the supplement: every claimed violation can be arbitrated, on demand.

Since December of 1979, Dana has had the benefit of the implemented contractual management of the employment of 12,000 employees. That contract contains a no-strike clause which constitutes an equivalent "waiver" of the First Amendment rights of those employees to peacefully picket and demonstrate. The strong public policy of this nation, as expressed repeatedly by Congress in favor of the free association of employees and collective bargaining, does not permit this court to enforce the First Amendment waiver implicit in a no-strike clause but not that of a corporate promise of neutrality.

■ Appellant finally argues that the District Court's temporary restraint and preliminary injunction against the making of "anti-union", "anti-UAW" communications constituted unlawful prior restraints of Dana's First Amendment rights. There was no prior restraint. Mr. Hoyle had already published Dana's views on two occasions before the first order to cease, pending arbitration, and the conduct upon which the Order was founded was clearly violative of both contract, if applicable, and law. The District Court had found the speech unprotected because of the waiver, in a probability sufficient for the entry of a restraining order after review of the evidence and arguments of counsel for both parties. The only governmental action of which Dana can complain is that of the

District Court, after adversary proceedings. None of Dana's cited cases are apposite, in this area.

■ But if this were to be considered as a prior restraint, it must be held a valid one. Such restraints require careful scrutiny, although they are not invalid per se. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). A court may validly restrain communications which are not protected by the First Amendment. *Rodgers v. U. S. Steel Co.,* 536 F.2d 1001, (3rd Cir., 1976). The restraint must be necessary to prevent "direct, immediate, and irreparable damage" or imminent threat to a competing protected public interest. *Bernard v. Gulf Oil Co.,* 619 F.2d 459 (5th Cir., 1980), *aff'd. on other grounds,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Finally, the restraint must be both narrowly drawn and the least restrictive means available. *Carroll v. President and Comrs. of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). The orders in this case have met all of those criteria. It is noteworthy that, to draw the restraint as narrowly as possible, the district court's purgation order gave Dana the alternative of cessation of its communications and corrective action, or of payment of accumulating fines.

■ Dana has no standing here to argue the First Amendment rights of its employees to listen to the communications in question. *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), stated the well-settled rule that "one may not claim standing to vindicate the constitutional rights of some third party."

The District Court's preliminary injunctive order and contempt order are also affirmed. A show cause hearing on the contempt motion was held on June 12th and the court's extensive memorandum and order filed June 20th, finding Dana in contempt. None of the court's extensive findings of fact are cited as clearly erroneous; moreover, it must at all times be remembered that the task of full interpretation and application of the parties' contract to the situation must be, as it was, left to the

arbitrator. Senior Judge Young exercised his discretion in the heat of this labor dispute with a skill which, even in hindsight, we cannot challenge.

AFFIRMED.

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.

I respectfully dissent from the majority for the following reasons. The District Court's injunctive orders enforcing the neutrality clause are unconstitutional prior restraints because they prohibit protected speech. The question whether the injunctions are valid under the *Boys Market* exception to the Norris-LaGuardia Act is therefore irrelevant to the proper disposition of this case. I write separately, setting forth my reading of the record and my analysis of the First Amendment question. I state the facts separately for two reasons. First, I interpret the record differently than does the majority. Second, the majority omits several important elements of the record from its discussion, including the express terms of the neutrality agreement and the language of the District Court's orders.

Dana and the UAW share a long history of collective bargaining. In 1979, they executed a Master Agreement which is currently in force. The Agreement provides that all disputes about its meaning and application shall be resolved through binding arbitration. It specifically lists the Dana facilities it encompasses, namely Dana's twenty-four manufacturing plants. In a subsequent letter supplementing the Master Agreement, Dana stated its intention to remain neutral if the UAW attempted to organize facilities not covered by the Agreement. The letter indicated that Dana would communicate with employees "not in an anti-union manner, but in a positive, pro-Dana manner." Dana also reserved the right to "speak out" in the event of "undue provocation" in any UAW campaign, a fact the majority fails to discuss.

This controversy arises from the UAW's attempt in December, 1979, to organize em-

ployees of the Wix Corporation, a wholly owned subsidiary of Dana, located in Gastonia, North Carolina. Wix's president, Bernie Hoyle, openly opposed the UAW's campaign. In anticipation of an NLRB election scheduled for June 12, 1980, Hoyle mailed a letter to his employees on April 28, listing ten "facts" about the UAW. Hoyle was also alleged to be responsible for posting anti-union material on Wix's bulletin boards. The UAW invoked the neutrality clause of the Master Agreement and initiated a grievance in response to Hoyle's actions. Although the parties scheduled several arbitration hearings, they could not agree on a convenient date. As a result, they never met.

Hoyle wrote a second letter to Wix employees on June 2. One week later, the UAW petitioned the District Court for the Northern District of Ohio, Western Division, to enforce the neutrality agreement and to compel Dana to submit to emergency arbitration. The court issued a temporary restraining order prohibiting Dana "from making anti-union or anti-UAW oral or written statements or other communications" to Wix's employees. The court also ordered Dana to remove all anti-union material from the bulletin boards and walls of the Gastonia facility. Finally, the court ordered Dana to submit to emergency arbitration.

Dana's general counsel read the terms of the court's order to Hoyle in a telephone conversation and told him that Dana expected his compliance. Nevertheless, on June 10, Hoyle made anti-union speeches to Wix employees during each factory shift. He also failed to remove anti-union material from the plant's bulletin boards and walls.

On June 11, the UAW decided to postpone the election, withdrew its application from the NLRB, and filed a motion to show cause why Dana should not be held in civil contempt. After a hearing the next day on the UAW's motion, the court held Dana in contempt of the temporary restraining order. It ordered Dana either to pay $250 per day, or to purge itself of civil contempt by:

(1) sending a repudiating letter to all Wix employees; (2) giving UAW representatives access to the audiences Hoyle addressed to enable the union to address them in Hoyle's mandatory presence; and (3) removing all anti-union material from Wix's environs. The order also required Dana to reserve at least half of each Wix bulletin board for pro-union materials, and to give the UAW daily access to the boards.

In a memorandum opinion, the District Court justified the temporary restraining order and the contempt order by speculating that the union election might be unfair: "In this case, with the election only three days away, to permit the defendant to continue to violate its agreement to remain neutral pending even the speediest arbitration *could* result in an unfair election. The result of arbitration would come too late to avail the plaintiff." (emphasis added). On June 27, the court issued a preliminary injunction against Dana, based on the facts and legal conclusions supporting its previous orders. The court also concluded that the UAW had shown the "traditional prerequisites" for injunctive relief:

It further appears that plaintiff will suffer immediate and irreparable harm if defendant is not restrained from making anti-union, anti-UAW communications to its employees at Gastonia pending a disposition of this lawsuit, in that, without such relief, defendant's Gastonia employees will continue to be subjected to anti-union, anti-UAW statements from the employer and *an election may be held without plaintiff being able to remedy such violation* thereby completely depriving plaintiff of any benefit from its neutrality agreement and rendering any arbitration to be held a hollow formality. (emphasis added).

The language of the injunction essentially mirrors that of the temporary restraining order.

On appeal, Dana raises numerous contentions, chief among them that the District Court's injunction enforcing the neutrality clause is an unconstitutional prior restraint. In my view, Dana is right in this contention for the following reasons.

As an initial matter, I reject the majority's conclusion that Dana has waived its arsenal of First Amendment rights by bargaining for and adopting the neutrality clause. The majority states that Dana knowingly, voluntarily, and intelligently agreed to curtail communications with its employees. In support of this conclusion, it cites *D. H. Overmeyer v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). Although I agree in principle that, under appropriate circumstances, a company may validly waive its First Amendment rights and agree to remain neutral in the face of union organizing efforts, as a matter of corporate policy, the record before this court will not support a broad waiver of the right to address employees. In my view, the majority mistakenly finds a waiver of the right to speak in an addendum to a collective bargaining agreement in which Dana promises, in vague terms, to remain "neutral" with respect to union organizing efforts. The agreement itself gives no content to the word "neutral," because Dana unequivocally retained the rights to make "pro-Dana" pronouncements and to "speak out" in certain circumstances.

The majority's conclusions ignore the well-settled rule that waivers of First Amendment rights may be inferred only in "clear and compelling" circumstances. *In re Halkin*, 598 F.2d 176 (D.C.Cir.1979). Recently this court held in *National Polymer Products v. Borg-Warner Co.*, 641 F.2d 418 (6th Cir. 1981), that court enforcement of a voluntary pre-trial agreement by an injunction prohibiting outside disclosure of trial evidence was an unconstitutional prior restraint. On the issue of voluntary waiver, we said that a waiver must be "clear and compelling," and "narrowly construed" in the context of the First Amendment. *Id.* at 423. *See also Bernard v. Gulf Oil Co.*, 619 F.2d 459 (5th Cir. 1980) (en banc), *aff'd on other grounds*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Rodgers v. United States Steel Co.*, 536 F.2d 1001 (3d Cir. 1976). In my view, the UAW's neutrality clause is not a sufficiently explicit waiver to support a sweeping ban on speech. *See Sambo's v. City of Ann Arbor*, 663 F.2d 686 (6th Cir. 1981).

Two cases involving judicial enforcement of CIA employment contracts illustrate the proper waiver analysis. In *Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980), the Supreme Court upheld the validity of the CIA's standard secrecy agreement, which requires CIA employees to submit proposed manuscripts to the CIA for review and censorship before publication. In *United States v. Marchetti*, 466 F.2d 1309 (4th Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972), the Fourth Circuit held that judicial enforcement of an identical secrecy oath was not an unconstitutional prior restraint on publication. *Snepp*, however, did not squarely answer the question whether one may validly contract to be subject to a prior restraint. Rather, the Court sanctioned the imposition of a constructive trust on profits earned by a former employee through breach of the CIA's standard secrecy agreement. In *Snepp*, breach of a contract purporting to waive the First Amendment right to uncensored publication was punished *retrospectively*, not prospectively.

I discuss these cases for two reasons. First, they exemplify the rigor with which the "clear and compelling" standard must apply to First Amendment waivers. As a condition of employment, both Snepp and Marchetti signed contracts that expressly recited national security considerations. The contracts required the applicants to waive their right to uncensored publication, after first reading the Espionage Laws, Act of June 25, 1948, as amended. Moreover, the contracts required clear disavowal of any ownership interest in information and intelligence gathered during tenure with the CIA. In short, the CIA contract was a clear, unambiguous and compelling waiver of a valuable rights.

Furthermore, both *Snepp* and *Marchetti*, fairly read, turned on the presence of compelling state interests—national security and confidentiality. The Supreme Court characterized Snepp's relationship to the CIA as that of a fiduciary, which carries "an extremely high degree of trust." 444

U.S. 507, 509, 100 S.Ct. 763, 765, 62 L.Ed.2d 704, 709. The Fourth Circuit was careful to note in *Marchetti* that "the law would probably imply a secrecy agreement had there been no formally expressed agreement . . ." 466 F.2d at 1316. No such compelling interests are present here to support inference of a valid waiver. The competing interest in this case is a pre-election atmosphere wholly favorable to the UAW. I am not persuaded that the UAW's private self-interest shares equal footing with national security and confidentiality.

Second, *Snepp* and *Marchetti* point to the critical issue in this case, which the majority fails to address: whether court enforcement of a contractual waiver of First Amendment rights is unconstitutional state action. I reject the majority's implicit conclusion that court enforcement of the neutrality clause is no more significant than enforcement of a private contract, without constitutional ramifications. It is clear to me that impermissible state action occurs when courts marshall their injunctive powers to enforce private agreements that operate as prior restraints on speech. As Judge Bazelon observed in *Halkin* :

> Even where individuals have entered into express agreements not to disclose certain information, either by consent agreement, *Crosby v. Bradstreet Co.*, 312 F.2d 483 (2d Cir.), *cert. denied*, 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963); or by an employment contract and secrecy oath, *United States v. Marchetti*, 466 F.2d 1309 (4th Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972), *the courts have held that judicial orders enforcing such agreements are prior restraints implicating First Amendment rights.*

598 F.2d at 189–190 (emphasis added). In *New York Times Co. v. Sullivan*, 376 U.S. 254, 264, 84 S.Ct. 710, 717, 11 L.Ed.2d 686, 697 (1964), the Supreme Court found sufficient state action in court enforcement of a common law rule to implicate the First and Fourteenth Amendments, noting: "[T]he test is not the form in which state power has been applied, but, whatever the form, whether such power has in fact been exercised."

In order to justify court enforcement of the CIA contract's covenant not to publish at issue in *Marchetti*, the Fourth Circuit first determined that the agreement itself did not violate the agent's First Amendment rights. The agreement specifically covered *only* an agent's use of *classified* information. The court was careful to emphasize the contract's narrow scope:

> As we have said, however, Marchetti by accepting employment with the CIA and by signing a secrecy agreement did not surrender his First Amendment right of free speech. The agreement is enforceable only because it is not a violation of those rights. We would decline enforcement of the secrecy oath signed when he left the employment of the CIA to the extent that it purports to prevent disclosure of unclassified information, for, to that extent, the oath would be in contravention of his First Amendment rights.

> Thus Marchetti retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain. 466 F.2d at 1317 (footnote omitted).

The court went on to say that "the risk of harm from disclosure is so great and maintenance of the confidentiality so necessary" as to warrant an administrative system of prior restraint. *Id.* at 1317.

It is clear from these cases that, although one may contract to waive one's First Amendment rights and to submit to prior restraint in a clear and unambiguous contract, a court's power to enforce such a bargain is narrowly circumscribed by the constitutional prohibition against judicial prior restraint. *National Polymer Products, Inc. v. Borg-Warner Corp., supra.* See *Bernard v. Gulf Oil Co., supra; Rodgers v. United States Steel Co., supra.* A court order enforcing a promise not to speak or publish transforms purely private action into state action, which is subject to strict

constitutional scrutiny. Thus, such an injunctive order must not operate as a prior restraint, either by its own terms or by those of the underlying agreement it enforces. In my view, injunctive enforcement of an ambiguous neutrality agreement against a party disputing its scope and application, must be judged by First Amendment standards.

Because I conclude that Dana has not waived its First Amendment rights, I need not dwell at length on the majority's statement that Dana lacks standing to raise the First Amendment rights of Wix employees to receive information in a robust campaign atmosphere. Nevertheless, I note that the First Amendment protects the free flow of information in the marketplace of ideas, as well as an individual's right to speak. *See, e.g., Linmark Assoc. Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977).

My view is compelled not only by the First Amendment, but by national labor policy as well. This court is committed to the policy that debate in union campaigns should be vigorous and open: "It is highly desirable that ... employees ... hear all sides of the [union] question in order that they may exercise the informed and reasoned choice that is their right," *NLRB v. Lenkurt Elec. Co.*, 438 F.2d 1102, 1108 (9th Cir. 1971) (citing *Colonial Corp. v. NLRB*, 427 F.2d 302 (6th Cir. 1970). To the extent that it frustrates this objective of national labor policy, the UAW's attempt to shield Wix employees from its adversary's views is misguided and paternalistic. As the Supreme Court observed in *Linmark*:

"There is ... an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them .... But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's.

It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us."

431 U.S. at 97, 97 S.Ct. at 1620, 52 L.Ed.2d at 164 (quoting *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976).

I turn now to consider the merits of Dana's appeal. Dana characterizes the temporary restraining order, the contempt finding, and the injunction as prior restraints of expression. Dana argues that, as such, these actions, while not unconstitutional per se, nevertheless require careful scrutiny. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). In *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (the "Pentagon Papers" case) the Supreme Court reiterated its admonition that a prior restraint bears a "heavy presumption against its constitutional validity." *See also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *CBS, Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975) (per curiam).

Traditionally, prior restraint has been defined as a "pre-determined judicial prohibition restraining specified expression ...." *Bernard v. Gulf Oil Co.*, supra at 467 [quoting *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 248 (7th Cir. 1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976)]. The District Court's injunction unquestionably creates a prior restraint. Its purpose and effect are not to punish speech after the fact, but rather to suppress it outright. By its terms, Dana is prevented from addressing its employees about union matters. It reaches future speech and conduct that presumptively fall within the purview of the First Amendment. *See, e.g. WXYZ, Inc. and Michigan Assoc. of Broadcasters v. Michael J. Hand*, 658 F.2d 420 (6th Cir. 1981); *Universal Amusement Co. v. Vance*, 587 F.2d 159 (5th Cir. 1978), *aff'd per curiam*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980).

Next, I must consider whether the prior restraint in this case withstands scrutiny. First, it must fit within one of the narrowly defined exceptions to the prohibition against prior restraints. For example, a court may validly restrain speech or information that is of such nature that it is not protected by the First Amendment. *Rodgers v. United States Steel Corp., supra,* (citing *New Jersey State Lottery Comm. v. United States,* 491 F.2d 219, 222 (3rd Cir. 1974) (en banc) *vacated on other grounds,* 420 U.S. 371, 95 S.Ct. 941, 43 L.Ed.2d 260 (1975) (per curiam)). Second, the restraint must be necessary to prevent "direct, immediate and irreparable damage" to a competing protected interest. *Bernard v. Gulf Oil Co., supra* at 473. Finally, the restraint must be both narrowly drawn and the least restrictive means available. *Carroll v. President of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *CBS, Inc. v. Young, supra.* Judged by these standards, the injunction entered by the District Court cannot stand. For the following reasons, I reject the majority's contrary conclusion.

First, the injunction does not fall within any exception to the prohibition against prior restraints. The injunction was entered in the context of a labor dispute. However, employer's speech is unquestionably protected by the First Amendment. *See, e.g. NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *Florida Steel Co. v. NLRB,* 587 F.2d 735 (5th Cir. 1979). Protection for employer's speech also springs from section 8(c) of the National Labor Relations Act, which provides that:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit. 29 U.S.C. § 158(c).

This court has consistently recognized that an employer's statements to his employees are within the guaranty of the First Amendment: "[N]either the (Act) nor the Constitution tolerates an abridgement of the right of an employer to communicate with his employees so long as he does not attempt to infringe (their) rights . . . as guaranteed by the Act." *NLRB v. Bangor Plastics, Inc.,* 392 F.2d 772, 775 (6th Cir. 1967). *See also NLRB v. Ford,* 170 F.2d 735 (6th Cir. 1948). *Accord Nebraska Bulk Transport, Inc. v. NLRB,* 608 F.2d 311 (8th Cir. 1979); *NLRB v. South Shore Hospital,* 571 F.2d 677 (1st Cir. 1978). In *Auto. and Meas. Div., Bendix Co. v. NLRB,* 400 F.2d 141, 145 (6th Cir. 1968), we stated:

> In this Circuit we have upheld the right of free speech in a Union organizational campaign and stated that its exercise should not be narrowly restricted. *N. L. R. B. v. Uniform Rental Serv.,* 398 F.2d 812 (6th Cir. 1968); *N. L. R. B. v. Hobart Bros. Co.,* 372 F.2d 203 (6th Cir. 1967); *Surprenant Mfg. Co. v. N. L. R. B.,* 341 F.2d 756 (6th Cir. 1965); *Union Carbide Corp. v. N. L. R. B.,* 310 F.2d 844 (6th Cir. 1962).

[quoted in *Colonial Corp. v. NLRB,* 427 F.2d 302, 306 (6th Cir. 1970).]

Furthermore, the question whether an employer's anti-union expression constitutes protected speech or an unlawful threat or promise can only be determined by careful balancing, as the Supreme Court outlined in *Gissel*:

> an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board. Thus, § 8(c) (29 U.S.C. § 158(c)) merely implements the First Amendment by requiring that the expression of "any views, argument, or opinion" shall not be "evidence of an unfair labor practice," so long as such expression contains "no threat of reprisal or force or promise of benefit" in violation of § 8(a)(1). . . .

Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the em-

ployees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.

395 U.S. 575 at 617, 89 S.Ct. at 1941.

With these principles in mind, I have examined the record. The District Court made no finding that Hoyle's letters or speeches were threatening or coercive before it restrained all future anti-union speech. The court merely found them to be "anti-union" rather than "pro-Dana." The fact that Hoyle's statements may have violated the spirit, if not the letter, of the neutrality clause does not deprive them of First Amendment protection. Nor does it establish with virtual certainty that any future speeches, letters or postings would be impermissibly coercive. The District Court's primary concern, however, was not for the rights of Wix employees. Rather, by its restraining order and injunction, the court attempted to give the UAW the benefit of its bargain. The court thus exalted a private interest over Dana's right to speak freely.

The majority concludes, without support in the record, that the District Court made an implicit determination that Hoyle's speeches and letters fell outside both First Amendment and section 8(c) protection. The UAW argues as well that the court below "may have found" that Hoyle's expressions were unprotected before it issued any restraint. However, I decline to speculate about the District Court's intentions and implicit findings when First Amendment interests are at stake. The record on appeal contains no express finding that Hoyle's speech violated federal labor laws. Absent a clear and explicit determination that Hoyle's speeches, letters, and notices are unprotected, the injunction cannot stand.[1]

Second, a prior restraint can only be supported by specific findings that the enjoined speech creates a "clear and present danger" or an imminent threat to a competing protected interest. *E.g. Near v. Minnesota ex rel Olson,* 283 U.S. 697; 57 S.Ct. 625, 75 L.Ed. 1357 (1931); *CBS, Inc. v. Young, supra. See also Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). In the words of Justice Brandeis, "only an emergency can justify repression", *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (concurring opinion). The District Court made no such findings. To the extent the majority today makes such findings, it far exceeds the scope of appellate review. The District Court entered its order to prevent *possible* taint to the union election, and to preserve the benefit of the UAW's bargain. The record does not convince me that an unfair election was imminent or that the UAW's bargain was seriously threatened. Indeed, the UAW *postponed* the election, and thus destroyed any urgency its claim may once have had.

The District Court did not consider whether the UAW's interests were substantial and compelling, approaching Dana's First Amendment rights in dignity and importance. *CBS, Inc. v. Young, supra.* I search the record in vain for any evaluation of the implications of the temporary restraining order or the injunction, or for any finding that Hoyle's speech would inevitably destroy the arbitration process and lead to an unfair election. Without findings to this effect, a prior restraint cannot be justified. *See Alberti v. Cruise,* 383 F.2d 268 (4th Cir. 1967).

Third, a prior restraint must not sweep too broadly. I agree with Dana that the District Court's injunction is fatally overbroad. The court's order enjoined future expression of *all* anti-union sentiments, and *"other communications"* with Wix employees. To the extent that it went beyond enjoining threats of reprisal or promises of

---

1. According to the UAW's brief, the District Court noted in a memorandum dated July 9, 1980 that Hoyle threatened reprisals and also promised benefits. However, I do not consider this an adequate finding for two reasons: 1) that order was entered a full week after the injunction was granted; and 2) the order was not made part of the formal record on appeal to this court, therefore I do not consider it. In any event, the language of the injunction prohibited much more than "threatening" or "promising" speeches.

benefits, the injunction is too broad to withstand scrutiny. *See Consolidation Coal Co. v. Disabled Miners of Va.*, 442 F.2d 1261 (4th Cir. 1971), *cert. denied*, 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184.

Finally, the District Court neither examined nor considered the alternatives available to the UAW under the federal labor laws that would have restricted Dana's First Amendment rights less drastically than injunctive relief. The Supreme Court has stated that "[i]n this sensitive field, the State may not employ means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Carroll v. President of Princess Anne, supra* at 393 U.S. at 184–185, 89 S.Ct. at 253.

It is clear that a less restrictive alternative was, in fact, available. The federal labor laws establish a scheme of retrospective penalties for infringements of employees' associational rights. These rights comprise the interest that the UAW ostensibly sought to protect. In no sense do the labor laws contemplate a system of prior restraint. The UAW could have filed unfair labor practice charges with the NLRB contesting the fairness of the election. The UAW could have then petitioned the Board to set the election aside and to order a new election, or to enter a bargaining order against Dana with respect to the Wix facility. *See NLRB v. Kaiser Agri. Chem. Div. of Kaiser A & C Co.*, 473 F.2d 374 (5th Cir. 1973). I reject the majority's assumption that the express remedies of the federal labor laws are inadequate.

Furthermore, to protect its own rights, the UAW could have tried more diligently to meet Dana at the arbitration table. The record shows that the UAW itself cancelled arbitration dates. Also, the record shows Dana's willingness to proceed to arbitration. Nevertheless, the UAW made no showing, and the court below no finding, that harm to the UAW could not have been averted by less drastic means than through prior restraint. The District Court's orders thus fail in all respects to meet the heavy presumption against their validity.

Accordingly, I would reverse the judgment of the District Court and remand for entry of an order dismissing the orders granting the UAW's motions for temporary and injunctive relief.

ORDER

A majority of the Judges of this Court in regular service have voted for rehearing of this case en banc. Sixth Circuit Rule 14 provides as follows:

The effect of the granting of a hearing en banc shall be to vacate the previous opinion and judgment of this Court, to stay the mandate and to restore the case on the docket as a pending appeal.

Accordingly, it is ORDERED that the previous decision and judgment of this Court is vacated, issuance of the mandate is stayed and this case is restored to the docket as a pending appeal.