**LOCAL UNION 15, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Plaintiff,**

v.

**EXELON CORPORATION, including its Wholly–Owned Subsidiaries, Exelon Generating Company, Exelon Business Services Company, and Commonwealth Edison Company, Defendant.**

**No. 01 C 7010.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 9, 2001.

Charles A. Werner, Christopher T. Hexter, Schuchat, Cook and Werner, St. Louis, MO, Thomas Deacon Allison, Michael H. Slutsky, Allison, Slutsky & Kennedy, P.C., Chicago, IL, for Plaintiff.

Brian Jeffrey Gold, James D. Weiss, Julie A. Koca, Sidley Austin Brown & Wood, Chicago, IL, for Defendant.

## *ORDER*

GOTTSCHALL, District Judge.

Plaintiff, Local Union 15, International Brotherhood of Electrical Workers, AFL–CIO (the "Union"), has filed a complaint for preliminary injunction against defendant Exelon Corporation including its subsidiaries ("Exelon"). The Union alleges that Exelon has implemented a layoff procedure in contravention of the parties' Collective Bargaining Agreement and Supplement ("Agreement"). The Union seeks an injunction compelling Exelon to stop the disputed layoff procedure, provide full benefits to employees forced on layoff, and return employees who were transferred or demoted to their original positions, until an arbitration can be completed pursuant to the Agreement. Exelon moves to dismiss the complaint for a preliminary injunction. For the reasons set forth below, Exelon's motion is granted and plaintiff's motion for a preliminary injunction is denied as moot.

### *Background*

Because the court is deciding a motion to dismiss, it accepts the Union's alleged facts as true. Both the Union and Exelon are parties to the Agreement, effective from April 1, 2001 to March 31, 2004, covering the wages, fringe benefits, and terms and conditions of employment of approximately 8,000 employees of Exelon who are represented by the Union. The Agreement was ratified by the employees in the bargaining unit on June 8, 2001. The Agreement provides that when Exelon

contemplates a layoff because of reduced workload, Exelon will "notify the Union and negotiate with the Union concerning a program for spreading the work, moving employees from one group or department to another, or other appropriate action." (Compl.Prelim.Inj.¶ 5.B.) After 30 days, if no program is agreed upon, then temporary and probationary employees are to be laid off first; then those employees affected by the work force reduction may exercise their seniority rights to laterally transfer to other locations or bump (demote) to the next lower job classification. The Agreement also provides that employees laid off have the right of recall based on seniority for two years. In addition, the Agreement provides that Exelon will not contract any work "which is ordinarily and customarily done by its regular employees if, as a result thereof, it would become necessary to lay off or reduce the rate of pay of any such employees." (*Id.* ¶ 5.D.)

The Union and Exelon have negotiated fringe benefits for the employees and their dependents. All benefits cease as of the end of the pay period in which bargaining unit employees are laid off. Bargaining unit employees on layoff status have the right under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") to elect continuation of some health benefits for up to 18 months provided that the employees pay the total cost of coverage plus a 2% administration fee.

On June 13, 2001, Exelon informed the Union that it was contemplating a layoff of 292 bargaining unit employees. On June 14, 2001, before conducting any meetings with the Union, Exelon scheduled meetings with between 275 and 300 employees; the Union claims that Exelon gave the employees false information at these meetings regarding their rights under the Agreement. The Union and Exelon held four meetings between June 13, 2001 and July 13, 2001. The Union claims that Exelon did not propose any programs for spreading the work as required by the Agreement. The Union also claims that there are between 500 and 800 contractor employees performing work which could be performed by regular employees, in contravention of the Agreement.

The Union alleges that Exelon has forced employees into layoff status by offering a severance package containing monetary benefits and continuation of fringe benefits (meaning that the employees would not have to pay 102% of COBRA premiums), provided that the employees sign a release severing their employment status and all rights with Exelon ("severance agreement"). The Union further claims that employees being forced on layoff are not given an opportunity to transfer or bump as provided in the Agreement, nor are they offered any travel or moving expenses for transfers, as provided in the Agreement. Specifically, the Union alleges that Exelon assigns employees to a "pool" or other job position at a location so far from the employee's current work location that the employees will not accept the new position and be forced on layoff. In addition, the Union alleges that Exelon has not terminated any contractors or contractor employees who continue to perform work that could be done by regular employees, in violation of the Agreement. The Union has filed a grievance concerning Exelon's layoff process. The dispute is subject to arbitration, pursuant to the Agreement.

On September 10, 2001, the Union filed its complaint for preliminary injunction, seeking an order from this court compelling Exelon to cease its layoff process, provide full fringe benefits to those employees forced on layoff or forced to sign the severance agreement, and return employees forced into different job positions

back to their original positions, until arbitration is completed. Exelon has filed a motion to dismiss the complaint, arguing that the Union has failed to allege any facts that establish that the employees would suffer irreparable harm without a preliminary injunction. The Union vehemently opposes this argument.

### Analysis

#### A. Legal Standard

Jurisdiction in this case is governed by the Norris–LaGuardia Act (the "Act"), 29 U.S.C. § 101. The Act provides:

> No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101. The Act has been recognized to "broadly prohibit[ ] federal courts from issuing injunctions in labor disputes." *Local Lodge No. 1266 Int'l. Ass'n of Machinists and Aerospace Workers v. Panoramic Corp.*, 668 F.2d 276, 279 (7th Cir. 1981).

Courts have recognized, however, that the Act does not necessarily preclude injunctions against employer breaches of collective bargaining agreements. *See id.* at 283. In *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court recognized an exception to the Act, which was later narrowed by *Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). "Such relief is available, in aid of arbitration, where the underlying dispute is subject to mandatory arbitration under the labor contract and where an injunction is necessary to prevent arbitration from being rendered a meaningless

ritual." *Panoramic*, 668 F.2d at 279. Courts have recognized four requirements in cases such as this. First, the case must be subject to arbitration. Second, the position that the Union will espouse in arbitration must be "sufficiently sound to prevent the arbitration from being a futile endeavor." *Id.* at 284–85. Third, there must be "the existence of actual or threatened irreparable injury." *Id.* at 285. Finally, the Union must "suffer more from the denial of an injunction than will the employer from its issuance." *Id.* at 288.

Exelon directly disputes only the irreparable injury requirement under this test. It argues that "even if, arguendo, the Union could establish the other elements required, it has completely failed even to allege facts that, if proven, could establish that it will suffer irreparable harm without injunctive relief." (Def.'s Mem. Supp. Mot. Dismiss at 4.) Because the court agrees with Exelon that the Union has failed to sufficiently allege irreparable injury, it need only discuss that requirement of the *Panoramic* test.

#### B. Sufficiency of Pleadings

The Union argues that the irreparable injury in this case includes the employees' loss of benefits, loss of jobs, loss of seniority rights, and the undermining of the Union. Exelon has argued that the Union has failed to allege any specific facts that, if proven, would establish irreparable injury. In response, the Union argues that it "is not required to allege all of its evidence in its notice pleading complaint." (Pl.'s Mem. Opp'n Def.'s Mot. Dismiss at 4.) The Union asserts that Exelon ignores a "fundamental rule that the Union's allegation of irreparable harm must be taken as true." (*Id.* at 2.)

The Union is mistaken. While it is true that the court must accept all well-pleaded allegations in the complaint as

true, *Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir.1993), it is also true that "conclusory statements of law ... and their unwarranted inferences-are not sufficient to defeat a motion to dismiss for failure to state a claim." *Northern Trust Co. v. Peters,* 69 F.3d 123, 129 (7th Cir. 1995). A determination of irreparable harm by this court would be a conclusion of law, not fact. *See Panoramic,* 668 F.2d at 285 (listing irreparable harm as a "prerequisite to an award of injunctive relief from breaches of collective bargaining agreements"). Therefore, the court cannot accept the Union's mere conclusory statement that it will suffer irreparable harm. Rather, the court must decide whether the Union has alleged enough facts that would establish irreparable harm. The court accepts-and Exelon concedes for the purpose of this motion-that all of the Union's factual allegations are true.

The Union relies on *Local 1461, International Brotherhood of Electrical Workers v. Commonwealth Edison,* 737 F.Supp. 52 (N.D.Ill.1990) for the proposition that the Union need only allege irreparable harm. It is true that the court in that case denied a motion to dismiss a complaint for injunctive relief in a similar setting. The union sought to enjoin the employer from implementing a drug testing program. The court held that "[i]nvasion of privacy, stigmatization, and humiliation have been held to constitute irreparable harm in the context of the employer's unilateral impo-

sition of a drug testing program." *Id.* at 55. Therefore, the court held that the union had indeed sufficiently alleged irreparable harm. *See id.* In the present case, however, the irreparable harm alleged by the Union involves loss of benefits, loss of jobs, loss of seniority rights, and the undermining of the Union. The court must consider whether these specific injuries are sufficient to establish irreparable injury. Thus, the court turns to the Union's allegations of facts.[1]

### C. *Irreparable Injury*

In labor disputes under the Act, the practice of most courts is to "focus into a single concept the twin ideas of irreparable injury and frustration of arbitration." *Panoramic,* 668 F.2d at 286. Irreparable injury does not simply mean "any injury resulting from a breach of contract that would not be fully redressed by an arbitral award." *Id.* at 285. Rather, the injury that the Union will suffer must be " 'so irreparable that a decision of the [arbitrator] in the [Union's] favor would be but an empty victory.' " *Id.* (quoting *Bhd. of Locomotive Engineers v. Missouri–Kansas–Texas R.R.,* 363 U.S. 528, 534, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960)). In other words, the injuries suffered by the Union must be such that an arbitrator would be unable to provide a suitable remedy absent a preliminary injunction. The Union has alleged four categories of injuries that it claims would be irreparable. The court will consider each in turn.[2]

---

1. The Union has indicated that it "will introduce evidence proving [irreparable harm] at the preliminary injunction hearing." (Pl.'s Mem. Opp'n Def.'s Mot. Dismiss at 4.) However, the court has provided the Union with ample opportunity to allege the facts that it believes establish irreparable harm, including an oral argument on that topic, at which the Union was invited to argue everything it hoped to prove. Therefore, the court presumes that the Union has alleged all necessary facts to decide this motion.

2. The Union stresses in its argument that the categories of injuries that it has listed should not necessarily be considered separately. Rather, it argues that without an injunction, the Union will suffer "compound irreparable harm." (Suggestions Supp. Pl.'s Compl. Prelim. Inj. at 5.) Although the court will address each category of injuries separately, it does not disregard the Union's "compound" argument.

## 1. Health Care Coverage

First, the Union argues that "[l]aid-off bargaining unit members will lose their Company-paid health insurance coverage at the end of the pay period following the layoff," and that "[t]he loss of this benefit is an irreparable injury." (Suggestions Supp. Pl.'s Compl. at 6.) Exelon argues that "[n]one of these employees ... will be forced to abandon health care coverage due to the layoff" because employees may "elect[ ] COBRA insurance coverage for eighteen months following the date of their termination" or receive company-paid benefits by signing the severance agreement. (Def.'s Mem. Supp. Mot. Dismiss at 6.) Furthermore, Exelon argues that if the arbitrator rules in favor of the Union, the arbitrator will have the authority to reinstate company-paid health insurance coverage to laid-off employees, as well as reimburse them for out-of-pocket expenses.

The court agrees with Exelon. The loss of health benefits in this case does not amount to an injury so irreparable that a favorable decision by an arbitrator would be an empty victory for the Union. If an arbitrator finds in favor of the Union on the merits of this case, the arbitrator will be capable of instituting several remedies. These include reinstating full fringe benefits to those employees from whom benefits were wrongfully withheld; providing reimbursement for any out-of-pocket losses that employees may have incurred in paying for COBRA premiums as a result of their wrongful layoff; and providing reimbursement for losses suffered due to medical expenses of employees unable to afford COBRA premiums. The Union also argues that the large volume of workers affected by the layoffs renders arbitration a futile exercise. The court disagrees. While remedying injuries for large numbers of injured employees would indeed make the arbitrator's task difficult, it would not make it impossible.

Courts have previously held that the loss of health care coverage in labor disputes does not constitute such irreparable harm as to justify issuing a preliminary injunction pending arbitration. *See Auto. Mechs. Local No. 701 v. Larry Faul Oldsmobile*, 524 F.Supp. 5, 7 (N.D.Ill.1980) (granting a motion to dismiss a complaint for an injunction to compel an employer to continue its contributions to the terminated employees' health care benefits during pendency of the arbitration); *see also Local 274, Hotel Employees and Rest. Employees v. Westin Bellevue Stratford*, 633 F.Supp. 869, 870 (E.D.Pa.1986) ("Although petitioner contends that seniority rights and ancillary health and pension benefits will be lost, I view these as easily converted to monetary terms.").

The Union cites only one other case governed by the Act in which a plaintiff sought an injunction in connection with a dispute subject to arbitration, for the proposition that "sudden loss of health insurance benefits for a sizeable group of employees may constitute irreparable harm." (Pl.'s Mem. Opp'n Def.'s Mot. Dismiss at 4.) In *United Steelworkers of Am. v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3d Cir. 1979), a labor dispute led the employer to threaten to withhold benefit premiums from union workers. In addition, the employer refused to enter arbitration. Holding that the employer's resort to self help frustrated and interfered with the arbitral process, the Third Circuit upheld the district court's injunction compelling the employer to provide the payments. *See id.* at 1279. However, the Third Circuit did not address how the arbitral process would have been frustrated by the employer's withholding of payments. It discussed only the obstruction of the arbitral process by the employer's refusal to arbitrate,

which is not present in this case. *See Auto. Mechs. Local No. 701*, 524 F.Supp. at 7 ("[I]t appears that the Third Circuit overlooked the requirement that some injury be shown to the arbitral process itself by the cessation of these payments."). In this case, as in *Automobile Mechanics Local No. 701*, the Union has not shown that the arbitrator could not remedy the employees' loss of benefits as a result of their layoffs. Thus, a favorable ruling in arbitration would not be an empty victory for the Union.

The Union argues that "it is unfortunately likely that before the arbitration process is completed, some will face serious health conditions requiring expensive treatment, but will be unable to afford it or alternate insurance." (Suggestions Supp. Pl.'s Compl. at 7.) The Union, however, fails to explain how such employees would be without a legal remedy via the arbitration process. *See Auto. Mechs. Local No. 701*, 524 F.Supp. at 7 (holding that the risk that an employee deprived of benefits would suffer medical expenses that would otherwise have been reimbursed by the employer does not mean that "the injured employee would be barred from filing a grievance to recover these costs"). Thus, the loss of benefits does not constitute an irreparable injury.

### 2. Severance Packages

■ The Union also argues that Exelon's "unilateral offer to each laid off employee of a severance package in return for a 'voluntary' resignation represents an independent irreparable injury." (Suggestions Supp. Pl.'s Compl. Prelim. Inj. at 7.) The Union's strongest statement in support of a finding irreparable injury here is that "there is a distinct possibility that an arbitrator will determine that he or she has no power to set aside the individual severance agreements that are not part of the collective bargaining agreement." (Pl.'s Mem. Opp'n Def.'s Mot. Dismiss at

6–7.) Exelon argues, however, that if the arbitrator indeed found in favor of the Union on the merits, it would have the authority to rescind the severance agreements, thereby remedying any injuries suffered by the affected employees. The court agrees.

This case is factually distinct from the situation in *Panoramic*, 668 F.2d 276. In that case, a union sought to enjoin an employer from breaching a labor contract by selling one of its divisions. The Seventh Circuit concluded that if the sale were allowed to proceed, it would result in the immediate loss of employment for many union workers. "Where, as here, employer action threatens a permanent loss of jobs, a damage remedy is inadequate." *Id.* at 286. The court held that the arbitrator might not have the authority to order a rescission of the sale contract after it had been entered. "Even if such authority existed, an arbitrator would likely be extremely reluctant to enter a rescission order given the practical difficulties of implementing it." *Id.* at 287. Therefore, the court concluded that the union had established irreparable injury. In the present case, however, there is not a threat of permanent loss of jobs. There is nothing to indicate that the arbitrator would not have authority to rescind Exelon's severance agreements if it found them invalid, and reinstate the wrongfully laid-off employees. *See id.* ("Reinstatement, the traditional remedy for employee discharges in violation of the labor contract, ... would be adequate to prevent irreparable injury to the Union."); *see also Lasco v. Northern*, 733 F.2d 477 (7th Cir.1984) (holding no irreparable injury where back pay is available); *Chicago Typographical Union No. 16/CWA 14408 v. Daily Racing Form, Inc.*, 1999 WL 160267 (N.D.Ill. March 10, 1999) (granting a motion to dismiss complaint for injunctive relief under the Norris–LaGuardia Act because an

arbitrator could reinstate the affected employee and award him back pay).

The Union also relies on *AlliedSignal, Inc. et al. v. B.F. Goodrich Co., et al.*, 183 F.3d 568 (7th Cir.1999) for the proposition that a "limitation of available remedies represents an irreparable harm sufficient to support an injunction." (Pl.'s Mem. Opp'n Def.'s Mot. Dismiss at 7.) This case is unhelpful. First, the case was not governed by the strict standards of the Norris–LaGuardia Act. In addition, the irreparable harm at issue did not concern a pending arbitration. Finally, the alleged injuries concerned the sharing of confidential information and unfair competition-quite different from the loss of benefits, jobs, and seniority rights, as well as the undermining of the Union, as alleged in this case. The question before the court in this case is whether an arbitrator would be powerless to remedy any injury caused by the severance agreements. The court concludes that an arbitrator would be able to grant such a remedy, making a preliminary injunction unnecessary for this issue.

### 3. Loss of Bumping Rights

■ The Union also argues that Exelon's "refusal to permit 270 employees selected for layoff to properly exercise their seniority rights, combined with the Company's pressure on improperly selected employees to resign, creates a unique form of irreparable harm." (Suggestions Supp. Pl.'s Compl. at 8.) Exelon counters that in the event of a favorable decision for the Union, an arbitrator would be able to "reconstruct the layoff process and provide sufficient remedies to all affected employees." (Def.'s Reply Mem. Supp. Mot. Dismiss at 11.)

The court agrees with Exelon that any violation of the employees' bumping rights could indeed be remedied by an arbitrator by reinstating any affected employees to their former positions with back pay. Al-

though such a remedy would be complex and difficult, there is nothing to indicate that the arbitrator would not have the authority or the ability to see it through. *See Int'l Bhd. of Elec. Workers Sys. Council U–4 v. Florida Power and Light Co.*, 784 F.Supp. 854 (S.D.Fla.1991) (rejecting a union's argument that the layoff of 350 employees would result in such displacement that the harm would be irreparable and concluding that the arbitrator could reinstate the employees to their former jobs with back pay). Thus, any violation of bumping rights does not constitute an irreparable injury that would mandate an injunction.

### 4. Undermining the Union

■ Finally, the Union argues that Exelon's "aggressive repudiation of the layoff and seniority provisions of the labor agreement will produce an intangible injury" to the Union itself. (Suggestions Supp. Pl.'s Compl. at 9.) The Union asserts that "[t]he underlying message of this layoff plan to those improperly selected for layoff is that the Union is powerless to stop the Company's repudiation of the agreement and therefore, acceptance of the severance agreement is safer than relying on relief in arbitration." (*Id.*) Exelon argues that it had no intention of undermining the Union and that any possible injury caused by such undermining can be remedied through arbitration.

The Union cites one case to support its argument. *See UAW v. Dana Corp.*, 679 F.2d 634, 642–43 (6th Cir.1982). In that case, the employer had sent a letter and delivered a speech to all employees that included anti-union communications as well as threats of action that the company would take against them if the union was recognized. This was allegedly in violation of a contract that provided that the company would remain neutral when the union

sought to organize workers. The district court issued an injunction to prevent the company from making further anti-union comments before the union's election to determine a collective bargaining agent for the employees. The Sixth Circuit held that the union had demonstrated irreparable damage because "[a]n arbitration award cannot restore a lost election." *Id.* at 643. Even if the election were set aside, the court concluded that such a remedy "would hardly constitute the vote of confidence, show of unity, and mandate for confrontation necessary to enter into negotiations." *Id.* The court cannot rely on that case to conclude that Exelon has undermined the Union here to such a degree that a favorable decision in arbitration would be an empty victory for the Union. There has been no anti-Union communications uttered by Exelon to its employees. Exelon has voluntarily entered into a collective bargaining agreement with the Union and has agreed to enter the arbitration process to resolve this labor dispute. In addition, there is no future election or other event making Exelon's "message" to employees so harmful as to constitute irreparable injury. The Union has otherwise failed to show that this "message" created by Exelon's layoff procedure has created an irreparable injury such that an injunction is necessary. The court holds that all four categories of injuries alleged by the Union fail to constitute an irreparable injury, either separately or as a "compound injury." [3]

### Conclusion

Based on the foregoing reasons, defendant Exelon's motion to dismiss the Union's complaint for preliminary injunction is granted. The Union's motion for preliminary injunction is denied as moot.

---

**3.** Exelon also argues that the Union's delays in filing both its grievance and complaint independently preclude a grant of injunctive relief. Because the court holds that the Union has failed to establish irreparable injury, it need not address this issue.