**BLOOMINGTON PARTNERS, LLC,
A LIMITED LIABILITY
COMPANY, Plaintiff,**

v.

**CITY OF BLOOMINGTON, AN IL-
LINOIS MUNICIPAL CORPO-
RATION, Defendant.**

No. 04–CV–2287.

United States District Court,
C.D. Illinois.
Urbana Division.

April 11, 2005.

---

**5.** There is no question that Fuller was not a Globetec director.

Thomas K. Tryboski, James M. DeZelar, Robbins, Salomon & Patt, Chicago, IL, for Plaintiff.

J. Todd Greenburg, City of Bloomington, Bloomington, IL, for Defendant.

## ORDER

MCCUSKEY, Chief Judge.

Following a hearing held on April 1, 2005, in which both parties were fully heard by this court, this court DENIED Plaintiff's Second Motion for Temporary Restraining Order and Preliminary Injunction (# 23). This court stated that a written order would be entered setting out the reasons for this court's ruling. Accordingly, this Order sets out this court's factual findings and analysis of the law.

## FACTS

Plaintiff, Bloomington Partners, LLC (BP), filed its Verified Complaint (# 1) against Defendant, the City of Bloomington (the City), on December 10, 2004. BP stated that its members are: Beacon Sports Properties, LLC, a Delaware limited liability company; Richard Adams, a citizen and resident of New Jersey; the Sporting Life, LLC, a California limited liability company; and Kemp Entertainment, LLC, a Nevada limited liability company. On December 20, 2004, BP submitted a Notice of Jurisdictional Statement (# 14) which set out the citizenship of all of BP's members and showed that none of its members are Illinois residents or citizens. This court therefore entered an Order (# 15) and concluded that this court has jurisdiction over this case based upon diversity of citizenship. *See Belleville Catering Co. v. Champaign Market Place, LLC,* 350 F.3d 691, 692 (7th Cir.2003).

In its Verified Complaint, BP sought an injunction requiring the City to engage in the dispute resolution procedures set out in Paragraph 16.2 of the Development and Management Agreement (Management Agreement) between BP and the City. Count I of the Complaint alleged breach of contract and Count II was based upon promissory estoppel.

On December 13, 2004, a hearing was held on BP's original Motion for Temporary Restraining Order (# 3) which was filed on December 10, 2004. BP sought a temporary restraining order enjoining the City from repudiating BP's Management Agreement and from negotiating or approving a new agreement with a third party, pending arbitration proceedings, as required by the Management Agreement. At the hearing, BP's counsel argued that "[t]here's no way the City could in good faith participate in that dispute resolution procedure if it had already entered into a contract with someone else."

After reviewing the exhibits presented, hearing argument and hearing the testimony of David LeFevre, principal in Beacon Sports Properties, this court concluded that BP had not met its burden to establish that an unambiguous, complete, and fully executed contract existed between the parties. This court noted that BP had provided only an unsigned copy of the Management Agreement. This court also agreed with the City's argument that it was unclear whether the exhibits referred to in the agreement had been submitted at the time the City Council adopted and approved the agreement on April 26, 2004. This court also concluded that BP failed to show that the City made unambiguous promises that were relied up on by BP. This court further noted that BP had not shown a reasonable likelihood of success on the merits or that it had an inadequate remedy at law. This court indicated that damages for breach of contract would be "easily determinable." This court therefore concluded that the requirements for injunctive relief had not been met. Accordingly, BP's original Motion for Temporary Restraining Order (# 3) was DENIED.

On March 24, 2005, BP filed its Second Motion for Temporary Restraining Order and Preliminary Injunction (# 23), with attached exhibits, and a Memorandum of

Law in Support (# 24). BP stated that it had received written discovery responses from the City which erased "any possible doubt" that BP and the City entered into an unambiguous agreement in April 2004. BP also stated that, after this court denied its original Motion for Temporary Restraining Order on December 13, 2004, the City Council, that same evening approved a new development and management agreement with an entity named BNAM, LLC, also known as Bloomington–Normal Arena Management, Inc. BP stated that the BNAM Agreement was substantially similar to BP's agreement with the City and even referenced many of the same exhibits. In its Motion, BP requested that this court enter an Order stating:

1. A temporary restraining order shall issue immediately ordering the City, whether directly or indirectly, alone or in concert with other person(s) [is] immediately enjoined and restrained until further order of this Court from performing any term of the BNAM Agreement or directly cooperating with BNAM in the performance of any such contract, or negotiating a management or development agreement with any other person or entity until further order of court.

2. The parties are directed to pursue dispute resolution procedures set forth in par. 16.2 of the BP Agreement as to all disputes which have been or could be raised between Bloomington Partners and the City of Bloomington. All proceedings herein between Bloomington Partners and the City are stayed pending final resolution of the disputes.

The documents attached to BP's Motion, which include a transcript of the December 13, 2004, hearing before this court, show the following facts. John Butler and Michael Nelson are Bloomington locals and have been involved in the planning of an indoor sports arena (Arena Project) in Bloomington since at least 2000. In June 2000, they approached Richard Adams regarding the Arena Project. According to Adams' affidavit, Nelson, Butler and Adams worked together throughout 2000, 2001, 2002, and early 2003 to bring a hockey team to the City and to establish themselves as the management of the Arena Project. Adams subsequently brought LeFevre into the project and also recruited Barry Kemp, the principal of Kemp Entertainment, LLC.

In January 14, 2002, the City entered into a Consulting and Sales Agreement with Central Illinois Arena Management, Inc. (CIA), an Illinois corporation. Nelson is president of CIA and Butler is its secretary. The agreement stated that the City "hereby appoints CIA as its exclusive agent providing consulting services related to the design and marketing of the [Arena] Project and to procure third party funding sources for the development of the Project."

According to LeFevre's affidavit, in the months following July 2003, Kemp, Adams, Butler, Nelson, and LeFevre agreed among themselves to jointly make a proposal to the City in the name of "Bloomington Partners," a to-be-formed entity, under which BP would manage the Arena Project, provide one or more anchor tenants, furnish food and beverage concession equipment, and otherwise give financing guarantees for the Arena Project. Contract negotiations continued during the latter months of 2003. A proposed Agreement, with attached Exhibits A–H, was sent to the City on December 3, 2003. In addition, during this time, the five individuals involved provided extensive financial and planning services to the City in connection with the Arena Project.

During January, February and March of 2004, LeFevre engaged in contract negotiations with the City regarding the content of the Management Agreement. A final

draft of the Management Agreement was submitted to the City on or about April 7, 2004. No changes were made to the Exhibits which had been provided to the City in December 2003. On April 26, 2004, a public meeting was held, and the City Council accepted and approved the Management Agreement by an 8–0 vote. On April 27, 2004, Mayor Judy Markowitz signed the Management Agreement on behalf of the City. The Management Agreement, drafted by LeFevre, provided, in pertinent part:

WHEREAS, the City is in the process of considering the development of a sports and entertainment center, currently known as the Bloomington Sports and Entertainment Center (the "Center"), to be located in downtown Bloomington and serving the surrounding regional markets;

.     .     .     .     .

WHEREAS, in furtherance of the development of the Center, the City has previously entered into a Consulting and Sales Agreement (the "CS Agreement"), a copy of which has been attached hereto as Exhibit A–1, with Central Illinois Arena Management, Inc. ("CIA");

WHEREAS, the CS Agreement provides that CIA will provide, as the City's exclusive agent, comprehensive services with respect to the development of the Center, such services to include assistance to the City in the design of the Center, the marketing and sale of key revenue generating sources for the Center, including naming rights, suites and club seats and sponsorships, the securing of primary tenants and the procurement of private and third-party funding sources for the Center;

WHEREAS, the CS Agreement also provides certain rights of CIA with respect to future management and operations of the Center;

WHEREAS, the parties acknowledge that the principals of CIA are principals of BP and that, by mutual agreement of the City and CIA, the CS Agreement will be terminated simultaneously with the execution of this Agreement in accordance with Exhibit A–2 hereof; . . . .

Exhibit A–2 was an unsigned Termination Agreement terminating the CS Agreement between the City and CIA. The Management Agreement, among other things, provided that BP would purchase naming rights for the Arena Project for $2 million and had the right to resell the naming rights to a third party.

The Management Agreement included paragraph 16.2, which set out a lengthy cooperation/mediation provision. Paragraph 16.2 provided that "any dispute arising hereunder will first be referred to the parties' respective agents or representatives prior to either party initiating a legal suit, who will endeavor in good faith to resolve any such disputes within the limits of their authority and within ninety (90) days after the commencement of such discussions." Paragraph 16.2 provided that, if any dispute remained unresolved, it would be subject to mediation and, if that was unsuccessful, arbitration. Paragraph 16.2(h) provided that a party could file a complaint to seek a preliminary injunction if such action was necessary to avoid irreparable damage or to preserve the status quo.

On May 3, 2004, Articles of Organization were filed establishing Bloomington Partners LLC as a limited liability company. On May 10, 2004, a press release was issued. The press release was prepared by Nelson and approved by Tom Hamilton, City Manager for the City. It stated that BP had signed a 10–year facility management agreement with the City, set out some of the details of the agreement, and

provided biographies of the five individuals involved in BP.

According to the affidavits of Adams and LeFevre, BP provided hundreds of hours of services to the City pursuant to the Management Agreement. However, in October 2004, Adams learned that Butler and Nelson were attempting to expel him from BP. Correspondence was subsequently exchanged between individuals involved in BP and Hamilton regarding BP's internal dispute.

On November 22, 2004, a City Council meeting was held. At the meeting, Hamilton stated that BP had never signed the Management Agreement approved by the City Council in April 2004. Hamilton further stated that it had come to his attention that fall that BP did not have an internal operating agreement. Hamilton stated that this put the City "in a very difficult situation of knowing who we would be dealing with." Hamilton stated that Butler and Nelson had done a great deal of work on the Arena Project and had a contract with the City. He further stated that he had received a proposal from BNAM. Hamilton stated that BNAM was "willing to take over that agreement, sign that agreement under the same terms and conditions." Hamilton stated that he believed "we have given the group known as Bloomington Partners ample opportunity to sign that agreement and to get their act together." Hamilton recommended rescinding the Agreement with BP and moving ahead with BNAM. At that meeting, the City Council voted to rescind the Agreement with BP, effective immediately, and directed staff to bring back a negotiated agreement with BNAM under the same financial terms on December 13, 2004, the date of its next meeting.

On November 29, 2004, Nelson and Butler submitted a written resignation from BP. On December 13, 2004, the City and BNAM signed a Development and Management Agreement. On December 13, 2004, BNAM also executed a Release and Hold Harmless Agreement. BNAM agreed that if "any court of law subsequently rules that the City of Bloomington is contractually obligated to Bloomington Partners, LLC, relating to the management of the City Arena, BNAM releases and holds the City harmless from any legal or equitable liability or duties of any kind which would otherwise result from its approval of the arena management agreement between the City and BNAM on December 13, 2004." Nelson and Butler have continued to work with the Arena Project as part of BNAM.

On March 31, 2004, the City filed its Response and Memorandum of Law in Opposition to Plaintiff's Second Motion for Temporary Restraining Order (# 25) and attached exhibits. The City again disputed that a valid, enforceable contract existed between the parties. The City attached the affidavits of Tom Hamilton and Tracey Covert, the City Clerk. Hamilton stated that the City never received a copy of the April 26, 2004 Management Agreement executed by BP. Both Hamilton and Covert stated that Exhibits A through H were not included in the materials which were voted on by the City Council on April 26, 2004. Both Hamilton and Covert also stated that, on April 27, 2004, the City entered into a revised agreement with CIA. A copy of this agreement was attached to both affidavits. This agreement was entitled "Pre-Opening Sales and Management Agreement" and was signed by Mayor Markowitz and Nelson and Butler. This agreement provided, in Paragraph 18, that "the City shall negotiate in good faith with CIA to enter into a Management Agreement for the operation and management of the sports and entertainment center which Agreement shall take effect upon substantial completion and opening of the Center. Further, CIA shall have a right of first

refusal with respect to any Management Agreement the City may negotiate with another entity." Paragraph 17 set out the compensation to be paid to CIA by the City. The Agreement also stated that "Paragraphs 17 and 18 shall survive termination of this Agreement except if replaced by a pre-opening agreement under the terms and conditions set forth by the agreement with Bloomington Partners." In their affidavits, both Hamilton and Covert stated that the City Council has never terminated this agreement.

At the hearing the parties submitted Joint Exhibit No. 1. This exhibit contained notes from a work session held on April 26, 2004, at which six council members and Mayor Markowitz were present. The notes were transcribed by Covert. Plaintiff argued that the exhibit supported its position that the Exhibits referred to in the Agreement were before the City Council on that date. The City argued that the notes actually supported its position that the City Council did not have the Exhibits.

## ANALYSIS

■■■ In considering a request for injunctive relief, a district court evaluates whether the moving party has shown: (1) a reasonable likelihood of success on the merits of the underlying claim; (2) no adequate remedy at law; and (3) irreparable harm if the injunction is not granted. *Jones v. InfoCure Corp.*, 310 F.3d 529, 534 (7th Cir.2002). The moving party must show all three necessary elements before injunctive relief may be granted. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir.2001). If an evaluation of these three points indicates that an injunction might be proper, the court must still weigh the potential harms to the parties and take into account public interest considerations before an injunction may be granted. *Jones*, 310 F.3d at 534.

At the hearing, BP's counsel argued that, based upon the evidence presented, a valid agreement existed between the parties which required them to engage in the dispute resolution procedures set out in Paragraph 16.2 of the Management Agreement. BP argued that the Management Agreement, along with Exhibits A through H, were before the City Council on April 26, 2004. BP noted that the City Council approved the Agreement, and Mayor Markowitz signed it on April 27, 2004. BP contended that its signature on the Management Agreement was not required because it accepted the Agreement by performance. This performance included work performed by Nelson and Butler on BP's behalf. BP further contended that the terms of the Management Agreement required the City to give BP notice and the opportunity to cure if the City believed BP was required to do something. BP also argued that the press release issued in May 2004, which was approved by Hamilton, is evidence that the parties intended to be bound by the Management Agreement. BP argued that the City's rescission of the Management Agreement on November 22, 2004, was further evidence that an agreement existed which had to be rescinded. BP contended that the City could not rescind the Management Agreement without proceeding with the dispute resolution procedures contained in the Agreement. BP insisted that it was entitled to the broad relief requested based upon Paragraph 16.2 of the Management Agreement.

In Response, the City argued that no valid, enforceable contract existed between the parties which required the City to engage in dispute resolution procedures with BP. The City contended that no complete, unambiguous agreement existed. The City pointed out that the Management Agreement was never executed by BP. The City also argued that the current con-

tract between the City and CIA shows that no enforceable contract exists between BP and the City. The City further contended that a review of Exhibits C and D shows that they are three-way agreements which are hopelessly ambiguous, unexecuted and unenforceable.

■■■■ "Whether under federal rules or state law, there is no arbitration without a valid contract to arbitrate." *Aste v. Metro. Life Ins. Co.*, 312 Ill.App.3d 972, 245 Ill. Dec. 547, 728 N.E.2d 629, 632 (2000); *see also Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 806 (7th Cir.2003), *cert. denied*, 540 U.S. 1149, 124 S.Ct. 1146, 157 L.Ed.2d 1042 (2004). The issue of whether the parties agreed to arbitrate is a matter of state contract law. *First Options of Chicago v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Hawkins*, 338 F.3d at 806; *Aste*, 245 Ill.Dec. 547, 728 N.E.2d at 632. In this case, the parties appear to agree that Illinois law applies to this diversity case. *See Ocean Atl. Dev. Corp. v. Aurora Christian Schools*, 322 F.3d 983, 995 (7th Cir. 2003); *Aste*, 245 Ill.Dec. 547, 728 N.E.2d at 633. Under Illinois contract law, a binding agreement requires a meeting of the minds or mutual assent as to all material terms. *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir.1999), *citing SBL Assoc. v. Vill. of Elk Grove*, 247 Ill.App.3d 25, 186 Ill.Dec. 939, 617 N.E.2d 178, 182 (1993); *see also Academy Chicago Publishers v. Cheever*, 144 Ill.2d 24, 161 Ill.Dec. 335, 578 N.E.2d 981, 984 (1991). To be enforceable, an agreement must include a sufficiently concrete expression of the essential terms of the agreement, as well as an intent to be bound by that agreement. *Ocean Atl. Dev. Corp.*, 322 F.3d at 995, *citing Academy Chicago Publishers*, 161 Ill.Dec. 335, 578 N.E.2d at 983. To determine whether the parties intended to be bound by the alleged contract, a court looks not to the parties subjective intent, but rather to objective evidence of their intent as expressed to each other in their writings. *Cohen Dev. Co. v. JMJ Properties, Inc.*, 317 F.3d 729, 735 (7th Cir.2003); *Abbott Labs.*, 164 F.3d at 387. The issue before this court "is largely based upon the expressed manifestations of intent of the parties to the document in question." *Chicago Inv. Corp. v. Dolins*, 107 Ill.2d 120, 89 Ill.Dec. 869, 481 N.E.2d 712, 714 (1985). The intentions of the parties are clearly relevant in the formation of a contract. *Lundberg v. Church Farm, Inc.*, 151 Ill.App.3d 452, 104 Ill.Dec. 309, 502 N.E.2d 806, 811 (1986).

■■■■ This court agrees with the City that Joint Exhibit # 1, which was admitted at the hearing, is more consistent with a conclusion that the Exhibits referred to in the Management Agreement were not before the City Council on April 26, 2004. However, BP has argued that the City's acceptance of the Agreement references and incorporates the Exhibits, so the City is bound even if it did not have the Exhibits before it. This court does not need to decide this issue because this court concludes, based upon the plain language contained in the Management Agreement, that the Management Agreement never became an enforceable agreement between the parties.

The Management Agreement specifically recognized that the City had entered into an agreement with CIA and provided that "the parties acknowledge that the principals of CIA are principals of BP and that, by mutual agreement of the City and CIA, the CS Agreement will be terminated simultaneously with the execution of this Agreement in accordance with Exhibit A–2 hereof." On the same date as Mayor Markowitz signed the Management Agreement, the City entered into a fully executed Pre–Opening Sales and Management Agreement with CIA. This agreement related to many of the same services as the

Management Agreement. As noted previously, this agreement provided, in Paragraph 18, that "the City shall negotiate in good faith with CIA to enter into a Management Agreement for the operation and management of the sports and entertainment center which Agreement shall take effect upon substantial completion and opening of the Center. Further, CIA shall have a right of first refusal with respect to any Management Agreement the City may negotiate with another entity." Paragraph 17 set out the compensation to be paid to CIA by the City. The Agreement also stated that "Paragraphs 17 and 18 shall survive termination of this Agreement except if replaced by a pre-opening agreement under the terms and conditions set forth by the agreement with Bloomington Partners." In their affidavits, both Hamilton and Covert stated that the City Council has never terminated this Agreement with CIA.

This court concludes, following its careful review of all of the exhibits submitted by the parties, that it is clear that it was the intention of the parties that the Management Agreement approved by the City Council was a replacement for the Agreement entered into with CIA, which covered much of the same subject matter. It is also clear that the parties intended that Nelson and Butler, as principals of CIA and BP, would be involved in the management of the Arena Project. The Management Agreement provided that the agreement with CIA would be "terminated simultaneously" with the execution of the Management Agreement. This court concludes that it is clear from the terms of the Management Agreement that it was not intended to be in effect until it was executed by BP and the Agreement with CIA was terminated. The evidence before this court shows that the Management Agreement was never executed by BP and the Agreement with CIA was never terminated. Accordingly,

this court concludes that the Management Agreement never became an executed, enforceable contract. *See Dolins*, 481 N.E.2d at 715–16. Therefore, the dispute resolution provisions contained in the Management Agreement are not binding on the parties.

This court further concludes that BP's arguments otherwise are not persuasive. This court concludes that the press release following the City's approval of the Management Agreement, which incorrectly stated that BP signed the Agreement, and the fact that the City believed it had to "rescind" the Agreement, do not show that the parties meant to be bound by the Agreement where the clearly expressed intention of the parties in the Agreement states otherwise. This court also rejects BP's argument that execution of the Management Agreement was not necessary because it accepted the Agreement by performance. Under the circumstances here, this court concludes that the parties intended that the Management Agreement had to be executed by BP and the Agreement with CIA had to be "terminated simultaneously" before the Management Agreement became an effective, enforceable contract.

Accordingly, BP has not convinced this court that an enforceable, complete, and unambiguous agreement exists which would require the City to engage in dispute resolution procedures with the remaining members of BP, which no longer includes Nelson and Butler as principals. Therefore, this court concludes that BP has not shown a reasonable likelihood of success on the merits and BP's Second Motion for Temporary Restraining Order and Preliminary Injunction (# 23) is DENIED.

■ As an alternative basis supporting this court's ruling, this court also finds that Plaintiff has not shown that it will

suffer irreparable injury if the relief sought is not granted. This court concludes that BP is requesting extraordinary relief in this case. BP is asking this court to enter an order precluding the City from proceeding with its contract with BNAM and ordering the City to pursue dispute resolution procedures with BP. As noted, at the original hearing, BP's counsel himself acknowledged that "[t]here's no way the City could in good faith participate in that dispute resolution procedure if it had already entered into a contract with someone else." This court agrees.

In support of its extraordinary request for relief, BP cited cases, most of which arise out of collective bargaining agreements, and argued that "a contractual provision requiring a party to a contract to engage in arbitration and other dispute resolution procedures is enforceable by an injunction, not only compelling arbitration, but prohibiting any conduct that would undermine the arbitration process." BP further contended that it is not required to show a likelihood of prevailing on the merits of the underlying contract dispute.

First of all, this court has serious doubts regarding whether federal labor law regarding the enforcement of arbitration clauses in collective bargaining agreements has any application to this case. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ("arbitration of labor disputes has quite different functions from arbitration under an ordinary commercial agreement"). Nevertheless, the cases cited do not support BP's argument because the cases hold that an injunction is only appropriate if the plaintiff can show irreparable injury.

In *Local Lodge No. 1266 Int'l Assoc. of Machinists & Aerospace Workers, AFL–CIO v. Panoramic Corp.,* 668 F.2d 276 (7th Cir.1981), the Seventh Circuit recognized that injunctive relief may be warranted to prevent employer breaches of collective bargaining agreements. However, "[s]uch relief is available, in aid of arbitration, where the underlying dispute is subject to mandatory arbitration under the labor contract and where an injunction is necessary to prevent arbitration from being rendered a meaningless ritual." *Panoramic,* 668 F.2d at 283; *Local Union 15, Int'l Bhd. of Elec. Workers, AFL–CIO v. Exelon Corp.,* 191 F.Supp.2d 987, 991 (N.D.Ill.2001). Accordingly, in order to show that injunctive relief is warranted, there must be "the existence of actual or threatened irreparable injury." *Panoramic,* 668 F.2d at 285; *Exelon Corp.,* 191 F.Supp.2d at 991. The cases have stated that "the injury that the Union will suffer must be 'so irreparable that a decision of the [arbitrator] in the [Union's] favor would be but an empty victory.'" *Exelon Corp.,* 191 F.Supp.2d at 992, *quoting Panoramic,* 668 F.2d at 285. "In other words, the injuries suffered by the Union must be such that an arbitrator would be unable to provide a suitable remedy absent a preliminary injunction." *Exelon Corp.,* 191 F.Supp.2d at 992. In *Panoramic,* the court concluded that this burden had been met because the employer action, the sale of corporate assets, threatened the permanent loss of jobs, so that a damage remedy was inadequate. *Panoramic,* 668 F.2d at 286. However, in *Exelon Corp.,* the court determined that this burden had not been met because the threatened loss of health care coverage, severance packages and bumping rights could all be remedied by an arbitrator. *Exelon Corp.,* 191 F.Supp.2d at 993–96.

At the hearing, BP stated that the best case in support of its request for relief is *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,* 999 F.2d 211 (7th Cir. 1993). In *Merrill Lynch,* the two defendants left Merrill Lynch's employ to work for a competitor, and disputes regarding

client lists and solicitation were submitted to an arbitrator. Merrill Lynch sought a temporary restraining order in the district court to keep the defendants from soliciting clients or disclosing client information pending arbitration. The district court issued the temporary restraining order, and the Seventh Circuit affirmed this order. The Seventh Circuit found that the available evidence, which indicated that the defendants took various documents and information pertaining to Merrill Lynch's clients and used that information to solicit Merrill Lynch's customers, sufficiently supported the district court's determinations regarding irreparable harm and the inadequacy of Merrill Lynch's legal remedy. *Merrill Lynch*, 999 F.2d at 215. This case, therefore, also shows that a plaintiff must show irreparable injury in order to obtain injunctive relief pending arbitration.

BP in this case has not argued that it will suffer any irreparable injury other than the loss of the benefit of its bargain with the City. This court concludes that this is not sufficient to warrant issuing a temporary restraining order and injunction prohibiting the City from proceeding with its contract with BNAM and compelling the City to pursue dispute resolution procedures with BP. This court notes that the Seventh Circuit has recognized that "of course the normal remedy for a breach of contract is merely an award of damages." *Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 709 (7th Cir.2004); *see also Jones v. InfoCure Corp.*, 310 F.3d 529, 535 (7th Cir.2002) (affirming denial of injunction in breach of contract case where money damages would be an adequate remedy). BP has argued that an award of damages is an inadequate remedy because the agreement provided for a 10–year term so damages could be considered "speculative." BP has cited no case law in support of this proposition and has, in fact, conceded that damages in this case are "far from being incalculable or impossible

to measure." Therefore, this court finds no basis for awarding BP the extraordinary relief sought.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Second Motion for Temporary Restraining Order and Preliminary Injunction (# 23) is DENIED.

(2) The Scheduling Order (# 22) entered on January 28, 2005, remains in full force and effect.